FILED

AUG 03 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No. CC-11-1692-MkDKi |
| | ) | |
| CAROLYN L. DAVIS, | ) | Bk. No. ND 11-10994-RR |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| CAROLYN L. DAVIS, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM**[*] |
| | ) | |
| BANK OF AMERICA, N.A.; ONEWEST | ) | |
| BANK; ELIZABETH F. ROJAS, | ) | |
| Chapter 12 Trustee, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on July 19, 2012
at Pasadena, California

Filed – August 3, 2012

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Robin L. Riblet, Bankruptcy Judge, Presiding

_____

Appearances: Jerry Namba of the Law Office of Jerry Namba argued on behalf of Appellant Carolyn L. Davis; Ellen Cha of Pite Duncan, LLP argued on behalf of Appellee Bank of America, N.A.; Mark D. Estle of the Estle Law Firm argued on behalf of Appellee OneWest Bank.

_____

Before: MARKELL, DUNN and KIRSCHER, Bankruptcy Judges.

_____

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

**INTRODUCTION**

Debtor Carolyn Davis ("Davis") appeals from the bankruptcy court's order determining that she was ineligible to be a debtor in a chapter 12[1] bankruptcy case and dismissing her case. We AFFIRM.

**FACTS**

The controlling facts are undisputed. This is Davis's second bankruptcy case. In July 2010, she filed a no-asset chapter 7 bankruptcy case,[2] and she was granted a discharge in November 2010. Davis commenced her current bankruptcy case by filing a chapter 12 bankruptcy petition in March 2011. Elizabeth Rojas ("Trustee") was appointed to serve as chapter 12 trustee.

In her schedules accompanying her chapter 12 petition, Davis listed over $4.1 million in secured debt.[3] According to her schedules, Davis owned three parcels of real property of significant value:[4] (1) a ranch located in Paso Robles, California ("Ranch"), (2) a residence located in Cayucos, California ("Residence") and (3) a triplex located in Paso

_____

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[2]United States Bankruptcy Court for the Central District of California, chapter 7 case no. ND 10-13744-RR.

[3]Davis listed no unsecured debt in her schedules because she had obtained her chapter 7 discharge only a few months earlier.

[4]There was a fourth parcel of real property that Davis listed, located in Atascadero, California. Davis represented that the Atascadero parcel was essentially worthless. In any event, the Atascadero parcel is not relevant to our analysis, inasmuch as it was not encumbered by any liens.

Robles, California ("Triplex"). According to Davis, at the time of her chapter 12 filing, the Ranch was worth $614,000 and was encumbered by a first trust deed in the amount of $2,663,190 and an equity line of credit in the amount of $254,911. Meanwhile, Davis valued the Residence at $670,000, and stated that it was encumbered by a first trust deed in the amount of $784,793 and an equity line of credit of $90,086. As for the Triplex, Davis valued it at $350,000 and listed a first trust deed encumbering it in the amount of $369,630. In addition to these secured debts, Davis listed property tax liens in the aggregate amount of roughly $9,500.

On its face, the total amount of debt Davis scheduled – $4,172,116 – exceeds the aggregate debt limit for chapter 12 cases set forth in § 101(18). That section provides in relevant part that the term "family farmer" means an "individual . . . whose aggregate debts do not exceed $3,792,650 . . . ."[5] In turn, only "family farmers" and "family fisherman" (as those terms are defined in § 101(18) and 101(19A)) are eligible to be debtors under chapter 12. See § 109(f).

In June 2011, Davis filed her chapter 12 plan, in which she proposed to pay the allowed amount of her secured debt over a period of 30 years. Each creditor holding an allowed secured claim would be paid interest only for the first three years at a rate of 3.35%, with both interest and principal payments thereafter, amortized over the next 27 years. All undersecured

---

[5]This debt limit is periodically adjusted pursuant to § 104. It was last adjusted, from $3,544,525 to $3,792,650, effective April 1, 2010.

portions of these encumberances were to be paid nothing.[6] Shortly thereafter, Davis amended her plan to provide for interest only payments for seven years, with the full amount of each allowed secured claim due immediately thereafter. Davis's amended plan also increased the interest rate to be paid on the claims secured by the Ranch and the Residence to 5.25% and the claim secured by the Triplex to 4.75%.

The Trustee and some of Davis's secured creditors filed objections to Davis's chapter 12 plan. Bank of America, one of the objecting secured creditors,[7] argued among other things that Davis was ineligible to be a debtor under chapter 12 because the aggregate amount of her debt exceeded the debt limit set forth in § 101(18).[8]

In response to Bank of America's ineligibility argument, Davis asserted that the undersecured portion of each secured creditor's claim should not be counted in determining her eligibility for chapter 12 because her personal liability had

---

[6]In conjunction with her plan, Davis commenced an adversary proceeding (1) seeking to strip down each undersecured lien to the value of the collateral securing it, (2) seeking to strip off each wholly unsecured lien and (3) seeking to determine the allowed amount of each secured claim as equal to the value of the collateral securing it.

[7]Bank of America, National Association as successor by merger to LaSalle Bank NA as trustee for WaMu Mortgage Pass-Through Certificate Series 2006-AR13 Trust ("Bank of America") claims to hold all right, title and interest to the loans secured by the first trust deed on the Ranch and the first trust deed on the Residence.

[8]The Trustee also questioned Davis's eligibility, but the Trustee did not elaborate on this point beyond raising the concern in her objection.

4

been discharged in her prior chapter 7 case. Based on this argument, Davis calculated the aggregate amount of her debt for eligibility purposes as $1,835,000 – equal to the value of the collateral securing all of the secured creditors' claims.

Ultimately, the bankruptcy court agreed that Davis was ineligible to be a chapter 12 debtor. It relied upon Quintana v. IRS (In re Quintana) ("Quintana I"), 107 B.R. 234, 239 (9th Cir. BAP 1989), aff'd ("Quintana II"), 915 F.2d 513 (9th Cir. 1990), which held that the undersecured portion of an essentially nonrecourse secured debt should be counted for purposes of determining chapter 12 eligibility.

On November 23, 2011, the bankruptcy court entered its order dismissing the chapter 12 bankruptcy case, stating that the $4.1 million in debt listed in Davis's schedules exceeded the debt limit set forth in § 101(18) and hence Davis was ineligible under § 109(f) to file a chapter 12 case. Davis timely filed her notice of appeal on December 7, 2011.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 157(b)(2)(A) and (L), and we have jurisdiction under 28 U.S.C. § 158.

## DISCUSSION

The sole issue presented in this appeal is whether, in light of Davis's prior chapter 7 discharge, chapter 12 eligibility as set forth in § 101(18) counts only the portion of her secured debt up to the value of the collateral. This question of the scope of obligations included within debt limits for eligibility purposes is a question of statutory interpretation subject to de

5

novo review. Quintana I, 107 B.R. at 236 (addressing chapter 12 eligibility); see also Ho v. Dowell (In re Ho), 274 B.R. 867, 870 (9th Cir. BAP 2002) (addressing chapter 13 eligibility).

There is a split of authority regarding whether the "aggregate debts" referred to in § 101(18) includes the discharged unsecured deficiency claims of secured creditors. If it does, Davis is ineligible; if it does not, she is. Two reported cases – one of which was reversed – have answered this question in the affirmative. In re Scotto-DiClemente, 463 B.R. 308, 311-14 (Bankr. D.N.J. 2012); In re Cavaliere, 194 B.R. 7, 13 (Bankr. D. Conn. 1996), rev'd, Cavaliere v. Sapir, 208 B.R. 784, 785-86 (D. Conn. 1997). And three reported cases have answered this question in the negative. In re Osborne, 323 B.R. 489, 493 (Bankr. D. Or. 2005); Cavaliere v. Sapir, 208 B.R. at 785-86; In re Winder, 171 B.R. 728, 731 n.5 (Bankr. D. Conn. 1994) (in dicta).[9]

But before we address any of these decisions, we first must look at Quintana I and Quintana II. As prior precedent of this Panel and the Ninth Circuit, they control the outcome of this appeal unless they are inapposite. In these cases, prior to the debtors' chapter 12 bankruptcy filing, the debtors were in default on secured debt in the original principal amount of $1 million. The secured creditor, Connecticut General Life Insurance Company ("CGLIC"), obtained prepetition a state court judgment on the debt in the amount of $1,527,861.89, plus a

---

[9]The above-cited cases arise under both chapter 12 and chapter 13.

6

decree entitling it to conduct a foreclosure sale of the real property collateral. But before CGLIC could conduct the foreclosure sale, the Quintanas filed their chapter 12 petition. In addition to the judgment in favor of CGLIC, the Quintanas listed debts in their bankruptcy schedules in the approximate amount of $60,000.

Asserting a claim in the amount of $1,527,861.89, CGLIC filed a motion to dismiss the bankruptcy case because the aggregate amount of the Quintanas' debt exceeded the debt limitation for chapter 12 eligibility.[10]

The Quintanas disputed that the entire $1,527,861.89 should be counted for eligibility purposes. They pointed out that, in the process of obtaining its state court judgment, CGLIC had agreed to waive "any right to seek a deficiency judgment . . . if, after any foreclosure sale of the mortgaged property, the debt was not fully satisfied." Id. at 515. They further asserted that, because this waiver had effectively transformed their debt into a nonrecourse obligation, the amount of the debt for eligibility purposes should be limited to the value of the collateral.

In Quintana I, we rejected the Quintanas' argument. We held that, for eligibility purposes, CGLIC's deficiency waiver did not limit the amount of the debt to the value of the collateral. We reasoned that, unless and until the collateral was sold, the full

---

[10]At the time of the Quintanas' bankruptcy filing, the debt limitation was set forth in § 101(17)(A), and was set at $1.5 million. Since that time, § 101(17) has been re-designated as § 101(18), and the amount of the debt limitation has been adjusted upward from time to time, pursuant to § 104.

7

$1,527,861.89 was still a "claim" or "right to payment" held by CGLIC, and hence still a "debt" of the Quintanas, as those terms are defined in the Bankruptcy Code. Quintana I, 107 B.R. at 237-39. We explained that the statutory definitions of "claim" and "debt" were coextensive and quite broad. As set forth in § 101(5), a "claim" includes any "right to payment" and any "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." And under § 101(12), the term "debt" means "liability on a claim."

We further reasoned that § 102(2) directly resolved the issue because, for Bankruptcy Code purposes, § 102(2) specified that a "claim against the debtor" means and includes a "claim against property of the debtor." Id. at 238.[11] We summed up our reasoning in Quintana I as follows:

> The obligation at issue in this appeal was personally created by the Quintanas. Even though Connecticut General has waived its right to pursue the remedy of a deficiency judgment, under section 102(2) the claim against the property is a claim against the debtors. Because the term claim is coextensive with the term debt, this obligation is a debt of the debtors which is defined by the amount of the claim against the property. Connecticut General's claim against the property is approximately $1.528 million because it has

---

[11]We further pointed out that the accompanying legislative history confirmed our interpretation of § 102(2):

> This paragraph [Section 102(2)] is intended to cover nonrecourse loan agreements where the creditor's only rights are against property of the debtor, and not against the debtor personally. Thus, such an agreement would give rise to a claim that would be treated as a claim against the debtor personally, for the purposes of the Bankruptcy Code.

Id. (quoting H.R.Rep. No. 95-595 at 315; S.Rep. No. 95-989 at 28, U.S. Code Cong. & Admin. News 1978, pp. 5814, 6272).

8

the right to payment of that amount from the property or from the proceeds of the sale of the property. Although, as a practical matter, Connecticut General will only be able to collect the value of the property, it has the right to payment of the entire obligation if under some circumstance, the property is sold for more than its present value. Therefore, although the collectability may be limited to the value, the right to payment is not so limited and consequently neither is the claim, nor the debt. Accordingly, notwithstanding the non-recourse nature of the obligation, the entire debt is to be considered in computing aggregate debts.

Id. (footnote omitted).

The Ninth Circuit affirmed Quintana I in Quintana II. Quintana II, 915 F.2d at 518. Whereas we focused on the relevant Bankruptcy Code provisions, the Ninth Circuit focused on the key provisions under Idaho law establishing that, unless and until the collateral actually was sold, CGLIC continued to hold a claim for $1,527,861.89, and hence the Quintanas continued to owe a debt in that amount at the time of their bankruptcy filing.[12]

Notwithstanding the difference in emphasis, the reasoning of both Quintana I and Quintana II is essentially the same. Quintana II necessarily decided that CGLIC's continuing right to recover the full amount owed against the collateral or the proceeds of the collateral meant that, for purposes of chapter 12 eligibility, the Quintanas continued to be indebted to CGLIC for

___

[12]Davis has not argued that there was any basis under state law for counting only the secured debt up to the value of the collateral. Instead, Davis entirely has relied on its claim regarding the effect of the prior chapter 7 discharge. To the extent Davis could have made any argument under state law, she has waived it by not raising it either in the bankruptcy court or on appeal. See Golden v. Chicago Title Ins. Co. (In re Choo), 273 B.R. 608, 613 (9th Cir. BAP 2002); Branam v. Crowder (In re Branam), 226 B.R. 45, 55 (9th Cir. BAP 1998), aff'd, 205 F.3d 1350 (9th Cir. 1999).

9

the full amount owed.  See Quintana II, 915 F.2d at 516-17.

Both Quintana I and Quintana II dovetail with the Supreme Court's subsequent decision in Johnson v. Home State Bank, 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991).  Johnson held that mortgage obligations may be restructured in a chapter 13 case even when the debtor previously has obtained a chapter 7 discharge extinguishing his or her personal liability for that debt.  Id. at 80, 111 S.Ct. at 2152.  Johnson reasoned that, even though the debtor no longer was personally liable for such mortgage obligations, the mortgagor's surviving rights against the collateral fell within the Bankruptcy Code's broad definitions of "debt" and "claim" and hence could be restructured in a chapter 13 case.  Id. at 80-85, 111 S.Ct. at 2152-55.

Johnson emphasized that the prior chapter 7 discharge did not wholly terminate the creditor's claim but rather merely extinguished "one mode of enforcing [the] claim - namely, an action against the debtor in personam - while leaving intact another - namely, an action against the debtor in rem."  Id. at 84, 111 S.Ct. at 2154.

Johnson further emphasized that Congress intended to include obligations enforceable only against the debtor's property within the Bankruptcy Code's definition of claim (and hence within the coextensive definition of debt.)  Id. at 85-87, 111 S.Ct. at 2154-55.  In discerning the congressional intent, Johnson in relevant part pointed to the text of and legislative history accompanying § 102(2) - the very same text and legislative history that we relied upon in Quintana I.

Particularly instructive for our purposes, Johnson opined

10

that the mortgagor rights surviving after the debtor's receipt of his chapter 7 discharge were the functional equivalent of a nonrecourse loan for purposes of applying § 102(2):

> . . . we must infer that Congress fully expected that an obligation enforceable only against a debtor's property would be a "claim" under § 101(5) of the Code.
>
> The legislative history surrounding § 102(2) directly corroborates this inference. The Committee Reports accompanying § 102(2) explain that this rule of construction contemplates, inter alia, "nonrecourse loan agreements where the creditor's only rights are against property of the debtor, and not against the debtor personally." <u>Insofar as the mortgage interest that passes through a Chapter 7 liquidation is enforceable only against the debtor's property, this interest has the same properties as a nonrecourse loan.</u> It is true, as the Court of Appeals noted, that the debtor and creditor in such a case did not conceive of their credit agreement as a nonrecourse loan when they entered it. However, insofar as Congress did not expressly limit § 102(2) to nonrecourse loans but rather chose general language broad enough to encompass such obligations, <u>we understand Congress' intent to be that § 102(2) extend to all interests having the relevant attributes of nonrecourse obligations regardless of how these interests come into existence</u>.

<u>Id.</u> at 86-87, 111 S.Ct. at 2155 (emphasis added and citations omitted).

In sum, while <u>Quintana I</u>, <u>Quintana II</u> and <u>Johnson</u> emphasize different points, each holds that obligations enforceable against the debtor's property but for which the debtor has no personal liability are nonetheless "claims" and "debts" within the meaning of the Bankruptcy Code. These decisions control the outcome of this appeal. Their reasoning simply cannot be reconciled with Davis's contention that the undersecured portion of the amount owed to her secured creditors does not count as a debt for eligibility purposes. As we explained in <u>Quintana I</u>, the full amount owed continues to be a claim against the collateral, and

11

hence a "debt" under the Bankruptcy Code, unless and until the collateral is sold. Furthermore, as stated in Johnson, a prior chapter 7 discharge only extinguishes one "mode of enforcing" the claim but does not extinguish the claim itself (or any portion thereof).[13]

We acknowledge the three reported decisions holding that, after a chapter 7 discharge, only the amount of debt owed up to value of the collateral is counted as debt for eligibility purposes. In re Osborne, 323 B.R. 489, Cavaliere v. Sapir, 208 B.R. 784, and In re Winder, 171 B.R. 728. But we don't find any of these three decisions persuasive. None of them effectively distinguished Quintana I, Quintana II or Johnson. Indeed, Cavaliere and Winder – as Connecticut cases out of the Second Circuit – don't even mention the Ninth Circuit precedent of Quintana I or Quintana II.

As for Osborne, its reasoning and efforts to distinguish both Quintana cases do not bear close analysis. In Osborne, after receiving a chapter 7 discharge, the Osbornes filed a chapter 12 petition. Id. at 490-91. The secured creditor, Farm

_____

[13]The discharge also did not extinguish the secured creditors' rights to assert the discharged debt as a setoff against any prepetition claim that Davis ultimately might have attempted to assert against the secured creditors. See Davidovich v. Welton (In re Welton), 901 F.2d 1533, 1538-39 (10th Cir. 1990); Camelback Hosp., Inc. v. Buckenmaier (In re Buckenmaier), 127 B.R. 233, 236-37 (9th Cir. BAP 1991); see also Carolco Television Inc. v. Nat'l Broad. Co. (In re De Laurentiis Entm't Group Inc.), 963 F.2d 1269, 1276-77 (9th Cir. 1992) (chapter 11 discharge did not prohibit creditor from asserting setoff in defense to claims asserted by reorganized debtor). In that sense as well, the secured creditors' deficiency claims would have survived Davis's chapter 7 discharge.

12

Credit, moved to dismiss the chapter 12 case on eligibility grounds. According to Farm Credit, it was owed over $1.4 million, and that amount when combined with other debts the Osbornes owed exceeded the $1.5 million family farmer eligibility limit set forth in § 101(18) at the time. Id. at 492. But Osborne held that, in light of the effectively nonrecourse nature of the debt owed to Farm Credit as a result of the prior chapter 7 discharge, the amount of debt to be counted for eligibility purposes should be limited to the value of Farm Credit's collateral – $480,500. Id. at 492-93.

In reaching this holding, Osborne imported into its eligibility analysis both § 506(a)(1)[14] and § 502(b)(1).[15] Osborne pointed out that, under § 506(a), Farm Credit's secured claim in the chapter 12 case would be limited to the value of the

_____

[14]Section 506(a)(1) provides in relevant part:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

[15]Section 502(b)(1) provides in relevant part that, if an objection to claim is filed:

the court, after notice and a hearing, shall determine the amount of such claim . . . , and shall allow such claim in such amount, except to the extent that –

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured; . . . .

13

collateral. As for any unsecured claim Farm Credit otherwise would have been entitled to under § 506(a)(1) for the remaining, undersecured balance it was owed, Osborne reasoned that, pursuant to § 502(b)(1), the unsecured claim was subject to disallowance because it was unenforceable as a result of the Osbornes' prior chapter 7 discharge. Id. at 493. Thus, according to Osborne, the fact that Farm Credit's unsecured claim was unenforceable and subject to disallowance (as a result of the prior chapter 7 discharge) meant that it had no claim at all for eligibility purposes.

Osborne further opined that Quintana II was distinguishable. According to Osborne, Quintana II's holding hinged on the fact that the collateral had not yet been sold, so the full amount of the debt still was collectible against the collateral (unless and until the sale of the collateral actually occurred), whereas the Osbornes' prior chapter 7 discharge already had rendered uncollectible the undersecured portion of the debt owed to Farm Credit. Id.

But Osborne's reasoning and its grounds for distinguishing Quintana II cannot be reconciled with Johnson, which stated that nonrecourse secured debt and undersecured debt subject to a chapter 7 discharge are functional equivalents under the Bankruptcy Code for purposes of the meaning of the terms "claim" and "debt." See Johnson, 501 U.S. at 86-87, 111 S.Ct. at 2155. Osborne also cannot be reconciled with Johnson's statement that the prior chapter 7 discharge only extinguished one mode of collecting the claim and not the claim itself. Id. at 84, 111 S.Ct. at 2154.

14

In any event, <u>Osborne</u> simply fails to offer any legitimate justification for using § 506(a) and § 502(b)(1) to diminish the amount of the Osbornes' debt for eligibility purposes.[16] <u>Osborne</u> claims that <u>Scovis v. Henrichsen (In re Scovis)</u>, 249 F.3d 975 (9th Cir. 2001) supports its usage of § 506(a) and § 502(b)(1), but <u>Osborne</u>'s reliance on <u>Scovis</u> is misplaced. <u>Scovis</u> held that the <u>entire amount</u> of debt owed to a wholly-undersecured secured creditor should be counted as unsecured for purposes of determining chapter 13 eligibility. <u>Id.</u> at 983-84.[17] In so holding, <u>Scovis</u> relied upon the "readily ascertainable" effect § 506(a) and § 522(f) would have on the secured creditor's claim in the chapter 13 bankruptcy case. <u>Id.</u> In short, <u>Scovis</u> stands for the relatively unremarkable proposition that, when determining a debtor's chapter 13 eligibility, the undersecured portion of a secured creditor's claim should be counted as unsecured debt.

Importantly, <u>Scovis</u> did not hold that undersecured nonrecourse claims should not be counted at all for eligibility purposes. Extending <u>Scovis</u> in this manner would bring it into

[16]<u>Cavaliere</u> similarly relies on § 506(a) and § 502(b)(1) to reach the same result as <u>Osborne</u>. Accordingly, we reject <u>Cavaliere</u> as well. As for <u>Winder</u>'s dictum, it is unclear how <u>Winder</u> reached its conclusion. Ironically, <u>Winder</u> cites to <u>Johnson</u>, but <u>Winder</u> does not explain how <u>Johnson</u> supports <u>Winder</u>'s dictum. As we have explained above, <u>Johnson</u> supports the opposite conclusion.

[17]Section 109(e), which governs eligibility for chapter 13, sets separate limits for secured debt and unsecured debt. In contrast, § 109(f), which governs eligibility for chapter 12, refers to the definition of "family farmer" in § 101(18) for its aggregate debt limits.

15

conflict with <u>Quintana I</u>, <u>Quintana II</u> and <u>Johnson</u>.  Thus, we decline to so extend <u>Scovis</u>.

Most importantly, there is a fundamental flaw in <u>Osborne</u>'s reasoning: it conflates bifurcation of claims into secured and unsecured portions (as addressed in § 506(a)), and the allowability of claims after objection (as addressed in § 502(b)(1)) with whether there is any claim in the first instance to be counted for eligibility purposes.  Congress clearly knew how to limit the type and nature of claims counted for eligibility purposes.  <u>See</u> § 109(e) (specifying that only noncontingent and liquidated claims should be counted for eligibility purposes).  But Congress chose to narrow neither the term "claim" nor the term "debt" in the manner <u>Osborne</u> suggests they should be narrowed – to only cover allowed or allowable claims.  Put another way, the statutes <u>Osborne</u> invokes concern the bifurcation and allowance of claims – issues which generally are beyond the scope of the inquiry into the existence of claims for eligibility purposes.[18]

---

[18]We also note that giving the chapter 7 discharge the effect <u>Osborne</u> urges would be the functional equivalent of enabling chapter 7 debtors to strip the liens of partially and wholly undersecured creditors.  But the Supreme Court has held that, notwithstanding § 506(d), chapter 7 debtors are not permitted under the Bankruptcy Code to engage in lien stripping.  <u>See</u> <u>Dewsnup v. Timm</u>, 502 U.S. 410, 417, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (holding that chapter 7 debtor is not permitted to "strip down" an undersecured lien); <u>see also</u> <u>Laskin v. First Nat'l Bank of Keystone (In re Laskin)</u>, 222 B.R. 872, 876 (9th Cir. BAP 1998) (extending <u>Dewsnup</u> to hold that chapter 7 debtor not permitted to "strip off" wholly unsecured lien).  Indeed, if Davis's chapter 7 discharge effectively had stripped down the secured creditors' liens to the value of their

(continued...)

16

We will not substitute <u>Osborne</u>'s judgment of how eligibility should work in place of Congress's apparent intent. When Congress's intent is clear based on the plain and unambiguous language of the statute, our task of construing the statute is at an end, so long as the statutory scheme appears coherent and consistent. <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 240-41, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Here, there is no ambiguity or incoherence in the broad definition of "claims" and "debts" used in the Bankruptcy Code. Nor did <u>Osborne</u> (or Davis) identify any inconsistency in the statutory scheme.

Consequently, we will assume that Congress has said what it meant and meant what it has said. <u>See</u> <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). If Congress believes that the scope of debts counted for eligibility purposes should be narrower, it will need to amend the statute. <u>See</u> <u>Lamie v. U.S. Trustee</u>, 540 U.S. 526, 542, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004).

## CONCLUSION

For all of the reasons set forth above, we AFFIRM the bankruptcy court's order dismissing Davis's chapter 12 case.

---

[18](...continued) collateral, it would have been unnecessary for her to file, as she did, a lien-stripping complaint in her chapter 12 case.

17